## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK ANTHONY SANDERS JR., | : | CIVIL NO: 1:13-CV-01595 |
| | : | |
| Petitioner, | : | |
| | : | (Judge Caldwell) |
| v. | : | |
| | : | |
| DONNA ZICKEFOOSE, | : | |
| | : | (Magistrate Judge Schwab) |
| Respondent. | : | |
| | : | |

## REPORT AND RECOMMENDATION

On June 14, 2013, the *pro se* petitioner, Mark Anthony Sanders Jr. ("Sanders"), a federal prisoner currently at USP Allenwood, filed a habeas corpus petition pursuant to U.S.C. § 2241. In his petition, Sanders raises two due process claims relating to, *inter alia*, the loss of good-conduct time credits he incurred following a disciplinary hearing, which, in turn, stemmed from an outbreak in violence among groups of prisoners at FCI Phoenix. Our recommendation on Sanders' ripe habeas petition follows.

## I.      General Background and Procedural History.

Sanders initiated this action on June 14, 2013, by filing a habeas corpus petition pursuant to 28 U.S.C. § 2241 along with corresponding exhibits, *see Doc.* 1, and, on July 8, 2013, Sanders paid the requisite filing fee. *Doc.* 4. Generally, in his petition, Sanders complains that his due process rights were violated during the

disciplinary hearing and appeal process, and he seeks to have, *inter alia*, his lost good-conduct time credit restored. *See id.* at 4-5.

After Sanders paid the filing fee, we ordered respondent to show cause as to why habeas relief should not be granted. *Doc.* 5. On August 12, 2013, respondent filed her response along with more exhibits, *see Doc.* 6, and on August 22, 2013, Sanders filed a reply, *Doc.* 7. Concerned about the potential for mootness, we issued two subsequent show-cause orders to the parties, to allow them to update the Court on the status of the case as it continued through the BOP's administrative appeal process. *See Docs.* 8 & 15. The parties having complied with our subsequent show-cause orders, *see Docs.* 9, 14 & 16, we are satisfied that the petition is officially ripe for review, and our concerns about the potential for mootness have been abated.

II.  **Jurisdiction and Venue**.

Title 28, United States Code § 2241, vests the federal district courts with jurisdiction to grant a writ of habeas corpus to persons in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c)(3). Under § 2241, review is available "where the deprivation of rights is such that it necessarily impacts the fact or length of detention." *Leamer v. Fauver*, 288 F.3d 532, 540 (3d Cir. 2002). Seeing as Sanders is in custody and challenges the length

of his detention, through the loss of good-conduct time credits, on a constitutional basis, we have jurisdiction over the pending habeas petition.

Moreover, the proper venue for a § 2241 proceeding is the petitioner's district of confinement. *See Meyers v. Martinez*, 402 F. App'x 735, 735 (3d Cir. 2010) (per curiam) (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)); *see also, Toney v. Fishman*, No. 12–2108, 2014 WL 1232321 (D.N.J. Mar. 25, 2014) (collecting cases). In this case, Sanders was confined at USP Allenwood, within the Middle District of Pennsylvania, at the time he filed his habeas petition, and by all indications, he is still confined there. Accordingly, this Court is a proper venue.

## III.  <u>Facts</u>.

On March 15, 2007, Sanders was sentenced in the United States District Court for the District of Colorado to 151 months imprisonment for bank robbery, in violation of 18 U.S.C. § 2113(a). *Doc.* 6-1 at 1-2. Sanders' scheduled release date is on October 27, 2017, *via* good-conduct time credit. *Id.*

On September 13, 2010, while federally imprisoned at FCI Phoenix, Sanders received a copy of an incident report charging him with rioting, in violation of Code 105. *See Doc.* 6-1 at 24. The rioting charge resulted from the following investigation, as described in the incident report by "Lt. Roman":

> An investigation completed on September 13, 2010, revealed that on September 3, 2010, at 6:00 p.m., *via* institution radio, the

3

Institution Control Center Officer announced that staff needed assistance due to staff witnessing a series of racially motivated altercations between African American and Hispanic inmates referred to as Paisas in Navajo Unit.  These inmates refused to comply with staff's repeated orders to stop the disruptive behavior.  Staff reported nearly 150 inmates were involved in altercations in multiple areas and chemical agents were requested [and utilized] . . . . These uncontrolled fights, assaults, and other actions caused the activation of the institution's mass staff recall system in order to have all available staff report to the institution in order to regain control of FCI Phoenix. Due to this unrestrained, violent, and unruly behavior, the institution consequently was placed under locked-down status.

Staff responded to the altercations and attempted to control these inmates.  The majority of inmates refused to comply with multiple orders from responding staff to stop fighting and to lie on the ground.  A relatively small number of inmates complied. Staff continued to issue verbal orders to the remaining inmates as they continued to assault each other by throwing chairs, computer monitors, fire extinguishers, and various other institutional equipment / furniture.   [As a result, there was approximately $2,137 in total damages].

Several homemade improvised weapons [were] recovered from the melee site. These improvised weapons included: combination pad lock with sling x 5, tube sock with weighted shrapnel x 8, long and broken metal / wood improvised stabbing weapon x 23, and a sharpened toothbrush handle x 1.

Three inmates due to the severity of their injuries [were] transported to an outside community hospital for treatment. Approximately 25 other inmates were treated at the institution's medical unit for their injuries from this disturbance.

In the course of this investigation it was discovered that the reason for this melee was over a disrespect issue (sic) between African American and Hispanic inmates originating from interracial cell assignments.

4

> When interviewed [Sanders] made the following statement: "I threw a couple of chairs we have a structure to get along peacefully but when [staff changes] it up! You have [a] problem!"
>
> Sanders was [further] discovered [to have an] abrasion to [his] right eye.

*Id.* In addition to receiving a copy of the incident report, Sanders was advised of his rights and stated he understood them. *Id.* at 26. Sanders did not request any witnesses. *Id.* Based on the report's content, the incident was referred to a Unit Disciplinary Committee ("UDC"). *Id.*

On September 15, 2010, Sanders appeared at a hearing before a UDC. *Id.* at 25. During the hearing, Sanders commented that his previous statement was not reflective of what happened, that "the timeline . . . is [also] inaccurate in some ways," and wants to call Lt. Roman as a witness to clarify the same, earlier, statements. *Id.* In the end, however, due to the severity of the alleged misconduct, the UDC hearing Sanders' case referred the incident to the Disciplinary Hearing Officer ("DHO"). *Id.*

Once the incident report was referred to the DHO, Sanders was provided with a copy of the "Inmate Rights at Disciplinary Hearing" Form, which he signed. *See id.* at 28. The signed Form specifically informed Sanders of the following rights:

      1. The right to have a written copy of the charge(s) at least 24 hours prior to appearing before the DHO;

      2. The right to have a full-time staff member, who is reasonably available, to represent him before the DHO;

      3. The right to call witnesses (or present written statements of unavailable witnesses) and to present documentary evidence on his behalf, provided institutional safety would not be jeopardized;

      4. The right to present a statement or to remain silent.  His silence, however, could be used to draw an adverse inference against him.  At the same time, his silence, alone, could not be used to support a finding of guilt;

      5. The right to be present throughout the disciplinary hearing except during a period of deliberation or when institutional safety would be jeopardized.

      6.  The right to be advised of the DHO's decision, the facts supporting that decision, except where institutional safety would be jeopardized, and the DHO's disposition in writing; and

      7. The right to appeal the decision of the DHO by means of the Administrative Remedy Procedure to the Regional Director within 20 calendar days of notice of the DHO's decision and disposition.

*Id.*  On the same date, Sanders was further provided with a copy of the "Notice of Discipline Hearing Before the [DHO]" Form, which he also signed.  *Id.* at 30.  On the latter form, Sanders requested "Mr. Rollins or Mrs. Moore" to be his staff representative and to have "Lt. Roman" called as a witness.  *Id.*

      On September 20, 2010, Sanders appeared before the DHO.  *See id.* at 32.  The DHO, on the DHO Report, noted that Sanders received advanced written

notice of the incident report, including the charge against him, and that he was advised of his rights beforehand.  *Id.*  Sanders also stated that he wished to proceed with the hearing.  *See id.*

At the hearing, Lt. Roman could not be called as a witness since he was the writer of the incident report.  *See id.* at 33.  "Mr. Rollins," Sanders' requested staff representative, however, provided a statement.  According to "Mr. Rollins," Sanders had stated that he was not informed of his rights at the initial investigation of the incident report.  *Id.* at 32.  Sanders, though, had also admitted to him that he (Sanders) threw a chair at a group that was coming towards him, but he did not throw "several" chairs.  *Id.*  "Mr. Rollins" further reported that Sanders had stated: "I threw a chair to protect myself, I bumped into a pillar trying to get up the stairs the reason (sic) this goose egg is on my right eye."  *Id.*

In addition to "Mr. Rollins'" statement, Sanders was permitted to testify. Sanders, who denied the misconduct charge against him, stated that he was going to the Chapel when someone threw something.  *Id.* According to Sanders, "[t]he unit [then] exploded.  The Mexicans were throwing things so I threw a chair to get away.  I was not an active participant in the riot.  I had just hit my head and I was going to tend to my wounds."  *Id.* Along with the statements provided by Sanders and Mr. Rollins at the DHO hearing, the DHO had a supporting memorandum from other staff members, which more or less corroborated the information

contained in the incident report, as well as photographic evidence to consider as evidence. *See id.* at 33, 38-50.

"Based upon the greater weight of the evidence" and Sanders' admission to "Lt. Roman" during the investigation interview, the DHO determined that Sanders committed the prohibited act of rioting, in violation of Code 105. *Id.* at 35. As a consequence, the following sanctions were imposed: (1) Disallow Good Conduct Time: 40 Days; (2) Disallow FF NVGCT Time: 60 Days; (3) Disciplinary Segregation: 60 Days; (4) Loss of Commissary, Phone and Visits: 1 Year; (5) Monetary Restitution: $153; and (6) Recommend Disciplinary Transfer. *Id.* at 36.

On September 21, 2010, a copy of the DHO's report was delivered to Sanders. *Id.* Sanders, moreover, was advised of his right to appeal the DHO's decision. *Id.*

Thereafter, Sanders filed an administrative appeal of the DHO's decision on the misconduct charge for rioting, and the Regional Director remanded said decision in order for the DHO "to reconsider the sanction imposed for Rioting, Code 105." *See id.* at 56; *see also, Doc.* 1-1 at 11. Upon remand, no new hearing was held, and given Sanders' placement at USP Allenwood at the time, it does not appear that Sanders was ever given advanced written notice of any amended misconduct charges. Nevertheless, on December 26, 2010, the prior DHO reconsidered the same evidence from Sanders' initial DHO hearing.

8

*Doc.* 6-1 at 52-56.  This time, upon reviewing the same evidence as before, the DHO concluded that "Sanders actively participated in a group demonstration by using physical force with Black Inmates against the Hispanic Inmates regarding officials' actions of cell assignments which resulted in damage to government property." *Id.* at 56.  As a result, "based upon the greater weight of the evidence," the DHO found that Sanders, instead, had committed the prohibited act of engaging in a group demonstration, in violation of Code 212.  *Id.*  For committing this amended misconduct charge, Sanders' sanctions were also amended as follows: (1) Disallow Good Conduct Time: 27 Days; (2) Disallow FF NVGVT Time: 27 Days; (3) Disciplinary Segregation: 30 Days; (4) Loss of Commissary and Visits: 1 Year; and (5) Recommend Disciplinary Transfer.  *Id.* at 54.

Sanders, who had since been transferred to USP Allenwood, did not receive a copy of the DHO's amended report until July 5, 2011.  *See id.*  Sanders, upon receiving a copy of the amended report, immediately filed an administrative appeal.  *See Doc.* 1-1 at 11.  On August 17, 2011, in response to Sanders' administrative appeal, the Regional Director wrote:

> A review of your appeal revealed questions concerning the disciplinary hearing record and the documentary evidence used to support the charge.  Accordingly, this disciplinary action is being remanded.  You will be notified of the date and time of any further proceedings.  After further proceedings, you may appeal again to this office if you desire.

*Doc.* 6-1 at 19.  According to respondent, no "further proceedings" occurred.  *See*

*Id.* at 2 n. 1.  The purpose of the remand, however, was not for a third hearing to

occur; rather, the Regional Director, in a memorandum directed to the Warden at

USP Allenwood, wrote:

> [T]his office has not received a copy of the disciplinary
> paperwork for [Sanders].  Without a complete copy of the
> disciplinary paperwork, a thorough review cannot be conducted.
> Accordingly, this disciplinary action is being remanded for
> institution staff to conduct a thorough search for the disciplinary
> record . . . .  The reprocessing of this disciplinary action should
> not exceed 30 days from the date of the memorandum.

*Id.* at 20.

Although the Regional Director mandated compliance with his

memorandum within 30 days, Sanders was not notified until July 31, 2013, that the

documents needed to process his administrative appeal had been received.  *See id.*

at 22.  *Via* the same correspondence, Sanders was further notified of his right to

now re-file his appeal to the DHO's amended report.  *Id.*

As of March 21, 2014, Sanders had not re-filed an administrative appeal of

the DHO's amended report.  *See Doc.* 9-1 at 2.  Nevertheless, on that same date,

Sanders was provided with additional notice of his appellate rights, and his

appellate rights were reinstated for another 30 days.  *Id.* at 6.  To date, there is no

record evidence that Sanders re-filed his administrative appeal concerning the

amended DHO report.  *See also, Doc.* 16-1 at 5.

## II.   **Discussion**.[1]

As we read Sanders' habeas petition, he complains about two issues: (1) that he was found guilty of, and sanctioned for, an amended misconduct charge without being present for a hearing or without notice of the amended charge; and (2) that a significant amount of time elapsed between the second remand and the notice he received in 2013 (and 2014), providing that he may re-file his administrative appeal.  According to Sanders, these issues qualify as due process violations, in violation of the Fifth Amendment, which constrains the conduct of the Federal Government and her agents.  The Fifth Amendment's Due Process Clause specifically provides that no person shall be deprived of life, liberty, or property without due process of law.  U.S. CONST. Amend. V.

In the prison context, federal prisoners have a liberty interest in good time credits. *Lang v. Sauers*, 529 F. App'x 121, 122 (3d Cir. 2013). At a disciplinary hearing that may result in the loss of good time credits, due process requires that an inmate "receive: (1) written notice of the charges at least 24 hours prior to a hearing; (2) an opportunity to call witnesses and present evidence in his defense;

---

[1]     "Federal prisoners are ordinarily required to exhaust their administrative remedies before petitioning for a writ of habeas corpus pursuant to § 2241," *Moscato v. Fed. Bureau of Prisons*, 98 F.3d 757, 760 (3d Cir. 1996).  Here, respondent, expressly and repeatedly, concedes exhaustion.  *Doc.* 6 at 6; *Doc.* 9 at 1, 3, 4-5, 6; *see Doc.* 16 at 2.  Thus, we devote no discussion to the issue in this Report.

(3) an opportunity to receive assistance from an inmate representative; and (4) a written statement of the evidence relied on and the reasons for the disciplinary action." *Id.* at 123 (citing *Wolff v. McDonnell*, 418 U.S. 539, 563–71 (1974)). Due process also requires that the DHO's decision be supported by "some evidence." *Id.* (quoting *Superintendent v. Hill*, 472 U.S. 445, 454 (1985)). A determination of whether there is some evidence to support the decision "does not require examination of the entire record, an independent assessment of the credibility of witnesses, or a weighing of the evidence." *Id.* (citing *Thompson v. Owens*, 889 F.2d 500, 502 (3d Cir.1989)).

In the federal prison system, the BOP also has, by regulation, adopted specific guidelines for inmate discipline procedures which are set forth at 28 C.F.R. § 541.1, *et seq.*  These guidelines are specifically tailored and designed to meet the due process requirements outlined by the Supreme Court in *Wolff.  See Von Kahl v. Brennan*, 855 F.Supp. 1413 (M.D. Pa. 1994).  Under these regulations, when prison staff have reason to believe that a prohibited act has been committed by an inmate, an incident report must be prepared and referred for investigation. 28 C.F.R. § 541.5.1.  After investigation, the incident report is referred to a UDC for an initial hearing.  28 C.F.R. § 541.7. The inmate, in turn, is entitled to notice of any proposed violation. The UDC may either reach a finding regarding whether a prohibited act was committed, or refer the case to the DHO for further hearing.

12

28 C.F.R. § 541.7(a). The DHO then has the authority to dismiss any charge, to find a prohibited act was committed, and to impose any available sanction for the act. 28 C.F.R. § 541.8. The hearing is conducted pursuant to the procedures set forth at 28 C.F.R. § 541.8.

Throughout this hearing process the inmate is provided with a series of procedural rights. For example, the inmate is entitled to notice of the alleged infraction. Specifically, the Warden must give the inmate advance written notice of the charges no less than 24 hours before the DHO hearing. 28 C.F.R. § 541.8(c). Upon request, the inmate is also entitled to staff assistance at DHO hearings. 28 C.F.R. § 541.8(d).

The inmate also has a series of procedural rights at the hearing itself. For instance, at the DHO hearing, the inmate is entitled to make a statement and present documentary evidence. The inmate also has the right to submit names of requested witnesses and have them called to testify and to present documents. While the DHO need not call repetitive witnesses or adverse witnesses, 28 C.F.R. § 541.8(f), the DHO shall call those witnesses who have information directly relevant to the charges and who are reasonably available. The inmate has the right to be present throughout the DHO hearing except during deliberation or when institutional security would be jeopardized. 28 C.F.R. § 541.8(e).

In addition, the regulations prescribe procedural standards for DHO decision-making. Thus, the regulations require that the DHO must consider all evidence presented at the hearing. The decision of the DHO must be based on the facts presented, and if there is conflicting evidence, it must be based on the greater weight of the evidence. Finally, the DHO must prepare a record of the proceedings. This record must be sufficient to document the advisement of inmate rights, the DHO's findings, the DHO's decision and the specific evidence relied upon by the DHO. The record must include a brief statement of the reasons for the sanction imposed. A copy of this record must be delivered to the inmate. 28 C.F.R. § 541.8(h).

Given the panoply of procedural protections afforded to inmates by these regulations, courts have consistently held that when prison officials comply with these regulations they fully satisfy the requirements of procedural due process in this prison disciplinary setting. *See, e.g., Fiore v. Lindsay*, 336 F. App'x 168 (3d Cir. 2009) (upholding disciplinary decision); *Macia v. Williamson*, 219 F. App'x 229 (3d Cir. 2007) (same); *Reynolds v. Williamson*, 197 F. App'x 196 (3d Cir. 2006) (same); *Levi v. Holt*, 193 F. App'x 172 (3d Cir. 2006) (same); *Sinde v. Gerlinski*, 252 F.Supp.2d 144 (M.D. Pa. 2003) (same).

Regarding Sanders' habeas petition, he does not complain that he was denied procedural due process protections during the original disciplinary hearing

wherein he was found guilty of committing the prohibited act of rioting. Moreover, after reviewing the record evidence, we find that Sanders was afforded every due process protection the Constitution and federal regulations require.

Sanders, however, takes aim at the DHO's amended report that was submitted without a hearing, wherein the original misconduct charge of rioting was changed, or amended, to engaging in a group demonstration. According to Sanders, he should have been provided with advance written notice of the amended misconduct charge before having been found to have committed the proscribed act, and he also should been brought in for a hearing on said amended charge.

As mentioned, *supra,* the DHO has the authority to dismiss any charge, to find a prohibited act was committed, and to impose any available sanction for the act. 28 C.F.R. § 541.8. Specifically, the relevant regulation governing the DHO's decision provides the following:

> (a) Available dispositions. The DHO will make one of the following decisions after a hearing on the incident report:
>
> (1) You committed the prohibited act(s) charged, *and / or similar prohibited act(s) as described in the incident report*;
>
> (2) You did not commit the prohibited act(s) charged; or
>
> (3) The incident report will be referred back for further investigation, review, and disposition.

28 C.F.R. § 541.8(a)(1)-(3)(emphasis added). This regulation, in addition to the others governing federal inmate disciplinary hearings, were developed to comply

15

with due process protections.  Furthermore, the Supreme Court in *Wolff* explained that inmates are required to receive at least 24 hours' notice of the alleged misconduct charge(s) in writing, before any hearing.  *See* 418 U.S. at 563-67.  The Court observed: "[T]he function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact."  *Id.*

When read in connection with *Wolff's* notice requirement, this Court has not hesitated to find that 28 C.F.R. § 541.8(f) authorizes a DHO to change, or amend, the misconduct charges on an incident report to conform to the charges which the evidence at a hearing later proves an inmate actually committed.  *See, e.g., Redding v. Holt*, No. 06-2254, 2007 WL 2155543, at *6 (M.D. Pa. July 26, 2007); *see also, Burnam v. Smith*, No. 12-128, 2013 WL 5530789, at *4 (D. Ari. Oct. 7, 2013)(collecting cases).   Importantly, however, in order for a DHO to constitutionally change, or amend, a misconduct charge, after an inmate has been provided with a copy of the incident report, without the need to provide additional advance-written notice, the factual nature of the alleged prohibited conduct must remain the same.  *See id.* at *7; *Northern v. Hanks*, 326 F.3d 909, 910-11 (7th Cir. 2003)(finding that the notice and investigation report given to the petitioner gave him all the information he would need to defend against an amended, or "modified," disciplinary charge); *Burnam*, 2013 WL 5550789, at *4 ("[O]ne court has held that if the key relevant facts regarding the new charge are not contained in

16

the incident report, a DHO cannot switch offenses without notice after [a] trial.")(citing *Fernandes v. Federal Bureau of Prisons*, 2007 WL 534457, at *2 (D. Mass. 2007)); *cf. Bonneau v. Thomas*, No. 11-801, 2012 WL 259911, at *3 (D. Ore. Jan. 27, 2012)(finding that the amended misconduct charge was "sufficiently different" from the original misconduct charge to warrant additional notice to the petitioner).

Here, we do not find, and Sanders does not assert or convince us otherwise, that the factual nature of the alleged prohibited conduct at all changed.  To the contrary, we expressly find that the two charges are sufficiently related such that, when Sanders was provided with a copy of the incident report, he had all the relevant facts presented to him to marshal in his defense on either charge and to even clarify the precise contours of the allegations against him.  We also recognize that Sanders does not mention how his strategy on remand would have changed if he was allowed to be present at a new hearing.  Similarly, Sanders does not cite to any new evidence that he would have presented, but did not present, or did not previously request to present, at the initial hearing.  Last, since no new evidence was considered by the DHO when amending the misconduct charge, "[Sanders] could not expect to be allowed to call witnesses or present new matters [or, for that matter, be expected to attend another hearing]. Thus there was no due process violation." *Davenport v. Roal*, No. 11-539, 2012 WL 625837, at *4 (S.D. Ill. Feb.

24, 2012)(citing *Wells v. Johnson*, No. 91 C 987, 1993 WL 79268, at *2-*3 (N.D. Ill. Mar. 16, 1993)). In short, Sanders' due process claim challenging the amended misconduct charge, without advance-written notice and / or a hearing, should be denied.[2]

With respect to Sanders' additional assertion that the delay in his disciplinary hearing and administrative appeal process amounts to a due process violation, we find that it likewise lacks merit. Sanders does not cite to, or allege, any harm or prejudice that he suffered in light of any delay by BOP officials handing his disciplinary misconduct hearings and appeals. *See also, Thibodeau v. Watts*, No. 05-2502, 2006 WL 89213, at *5 (M.D. Pa. Jan. 11, 2006) (holding that a BOP director's untimely response to petitioner's Administrative Remedy appeal did not amount to a due process violation). This due process claim therefore should also be denied.[3]

---

[2]    Although it is not directly challenged by Sanders, we find that there was "some evidence" for the DHO to find that Sanders committed the conduct prohibited by Code 212.

[3]    To the extent Sanders is complaining about the fact that no new hearing was held following the second remand, we fail to find any due process violation. Indeed, the Regional Director's letter to the Warden at USP Allenwood clarifies the purpose of the second remand was simply to recover the disciplinary hearing records. Moreover, in any event, a failure to hold any disciplinary hearing does not, alone, amount to a constitutional violation since Sanders, in this case, was provided with multiple opportunities to file administrative appeals on the DHO's amended record once his disciplinary records became available. In other words, he

## IV.    **Recommendation.**

Based on the foregoing, **WE RECOMMEND** that Sanders' petition for the

writ of habeas corpus (*Doc.* 1), pursuant to 28 U.S.C. § 2241, be **DENIED**.  The

Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter
> described in 28 U.S.C. § 636 (b)(1)(B) or making a
> recommendation for the disposition of a prisoner case or a
> habeas corpus petition within fourteen (14) days after being
> served with a copy thereof.  Such party shall file with the clerk of
> court, and serve on the magistrate judge and all parties, written
> objections which shall specifically identify the portions of the
> proposed findings, recommendations or report to which objection
> is made and the basis for such objections.   The briefing
> requirements set forth in Local Rule 72.2 shall apply.  A judge
> shall make a de novo determination of those portions of the
> report or specified proposed findings or recommendations to
> which objection is made and may accept, reject, or modify, in
> whole or in part, the findings or recommendations made by the
> magistrate judge.  The judge, however, need conduct a new
> hearing only in his or her discretion or where required by law,
> and may consider the record developed before the magistrate
> judge, making his or her own determination on the basis of that
> record.  The judge may also receive further evidence, recall
> witnesses or recommit the matter to the magistrate judge with
> instructions.

Submitted this **20th** day of **July, 2015**.

***S/Susan E. Schwab***
Susan E. Schwab
United States Magistrate Judge

---

had an opportunity to be heard.  Sanders, however, never filed an administrative
appeal.